THE SUPERVISORS OF ONONDAGA COUNTY *v.* LEROY MORGAN
and others, Committee of Alfred Tyler, a Lunatic.

A person convicted of murder was, before sentence was passed, upon due examination found to be insane, and was discharged from imprisonment and sent to the State lunatic asylum at Utica. The expenses for his maintenance, clothing, etc., while there, were advanced or paid by the treasurer of the county from which he was sent. In an action by the supervisors of the county against the committee of the criminal's estate, it being proved that such committee held property of the criminal more than sufficient to reimburse the county for the money advanced, it was *held*, that they were entitled to recover the amount so advanced, the case being within the provisions of sections thirty-one and thirty-two, as construed in the light of sections thirty-three and thirty-six of chapter 135, Laws of 1842. (DENIO, Ch. J.)

APPEAL from a judgment of the Supreme Court, by which the plaintiffs recovered $651.06 and the costs against the defendants, as a committee of the estate of Alfred Tyler, a lunatic, to be paid out of his estate in their hands upon a demurrer to the complaint. The defendants appeal from the judgment of the General Term affirming the one rendered at the Special Term. The case was submitted on printed briefs.

*Morgan & Middleton*, for the appellants.

*N. B. Smith*, for the respondents.

DENIO, Ch. J. The complaint sets forth that Alfred Tyler was tried in the Onondaga Oyer and Terminer in March, 1855, and convicted of the crime of murder; that in May following, while he was yet in prison, and before sentence had been passed, the county judge of that county, pursuant to certain provisions of the statute relating to the State lunatic asylum, instituted an examination to ascertain whether Tyler was insane, and, having ascertained that to be his condition, ordered him to be discharged from imprisonment; and to be put in safe custody and removed to and kept at the State asylum at Utica, until restored to his right mind, and, when that should take place, the superintendent of the asylum was

to inform the said judge, and the county clerk and district attorney of that county of the fact, to the end that he might be remanded to prison; that Tyler was accordingly removed to the asylum, where he had since been confined; and that the treasurer of the county had paid to the treasurer of the asylum, on the order of the steward, for his clothing and maintenance, several sums, amounting together to $523.33, no part of which had been repaid to the county. It then set forth certain proceedings at a special term of the Supreme Court, which resulted in the appointment of the defendants as a committee of the estate of Tyler; that they assumed the trust, and that they had possessed themselves of his property to an amount more than sufficient to reimburse the county for the money so paid. The prayer was that they should be adjudged to pay the sums so advanced by the county. It was stated that the action was brought by the leave of the court.

The defendants' counsel relies, in support of the demurrer, upon the general provisions of law by which the expense of maintaining prisoners in jail for criminal offenses, whether before trial or after conviction, is a charge upon the county. The plaintiffs, on the other hand, insist that Tyler after his removal to the asylum was no longer in prison within the meaning of these provisions, but that his estate, in the hands of his committee, is liable for his support, according to the effect and fair meaning of the statute to organize the State asylum. (Laws 1842, ch. 135.)

The thirty-first section of the act declares that persons who have escaped indictment or been acquitted of criminal charges on trial, on the ground of insanity, shall, after careful inquiry by the court and the ascertainment of the fact, be ordered into safe custody and be sent to the asylum. It further provides that the county from which such a person is sent, shall defray all his expenses while there, and of sending him back, if returned, and concludes as follows: "But the county may recover the amount so paid, from his own estate, if he have any, or from any relative, town, city or county that would have been bound to provide for and maintain him elsewhere." The next section (the thirty-second)

declares that if any person in confinement under certain circumstances mentioned, including those " under a criminal charge or under any other than civil process" shall appear to be insane, the first judge of the county shall institute a careful investigation, aided by the testimony of physicians and others; and that if, after an invitation to the district attorney, and by a jury if thought necessary, he be satisfactorily proved to be insane, the judge is to discharge him from imprisonment " and order his safe custody and removal to the asylum, where he shall remain until restored to his right mind," when, if the judge has so directed, information is to be given by the superintendent to the judge, the county clerk and the district attorney, so that he may be remanded to prison, and criminal proceedings may be resumed or he be discharged.

The section concludes as follows : " The provisions of the last preceding section requiring the county to defray the expenses of a patient sent to the asylum, shall be equally applicable to similar expenses arising under this section and the one next following."    The thirty-third section, which is next in order, contains a similar provision as to persons imprisoned on civil process, attachment, or for non-payment of a militia fine, and who shall become insane.    A similar inquiry is to be made, and if insanity is found, the person is to be discharged from imprisonment and ordered into safe custody and sent to the asylum ; " nevertheless," it is added, " the creditor may renew his process, and arrest again his debtor when of sound mind."

It is conceded that the estate of the insane person is liable for his maintenance at the asylum in cases within the thirty-first section, such being the express language of the law ; but it is argued that the words of reference in the thirty-second section, which embrace the case of Tyler, only incorporate the portion of the provisions which charge the county with the expenses, and not the part providing for a reimbursement from the estate, etc., of the person supported.    The language is not perfectly explicit, and a verbal interpretation may support the defendant's position.    But I am of the

opinion that the intention was to incorporate the whole of the provisions respecting the expenses at the asylum contained ,in the thirty-first, into the thirty-second section, as well that one which furnishes the indemnity as that which charges the county. The word *provisions* is put in a plural form, though the language imposing the charge in the first instance on the county is a single provision. In a general way it may be said that "the provisions of the last preceding section, requiring the county to defray the expenses of a patient sent to the asylum," are those which require the county to advance the amount in the first instance, and to be indemnified for the advance out of the estate of the patient, if he have any, and from the other sources indicated if he have none. The circumstance that the cases embraced in the thirty-third section are placed in the same category with those in the thirty-second, adds force to this construction. These are cases of imprisonment in civil suits, where the public were never bound to support the person imprisoned, even when in jail. It would be strange if he should be required to be maintained at the public expense in an asylum when he happened to become insane, though he had property to maintain himself.

This construction is further supported by the thirty-sixth section, which is a general provision, embracing the expenses of every insane person supported in the asylum, without regard to the manner in which he was sent there, declaring that such person shall be personally liable for these expenses. In terms it completely covers the case of Tyler. If it can be taken out of that provision, it must be on the ground that there is something in the fact that he had been an offender against the laws before he became insane, which should exempt his property from the burden of his support. But surely we cannot impute any such policy to the legislature.

The case of *The People* v. *The Supervisors of Genesee* (7 Hill, 171) has no application to this case. That was an attempt to charge a town in Genesee county with money paid by that county for the support of a person sent to the asylum; but as that person was not a pauper but a person in

indigent circumstances only, it was held that the town was not liable for her support under any other circumstances, and as the act relating to the asylum did not give the county a remedy against the town in such cases, the proceeding by the county to charge the town was not sustained.

I am in favor of affirming the judgment of the Supreme Court.

POTTER, J.   In 1842 an act of the legislature was passed entitled "An act to organize the State Lunatic Asylum, and more effectually to provide for the care, maintenance and recovery of the insane." (Chap. 135.)   This act, containing fifty-one sections, provided a general system in regard to all the insane to be cared and provided for at the State institution.   At the time of the passage of this act, there was in force, by virtue of title three, chapter twenty, part one of the Revised Statutes, an act entitled " Of the safe keeping and care of lunatics," containing certain other provisions in regard to that class of persons.   There was also in force at the same time, by virtue of article ten, title two, chapter five, part two of the Revised Statutes, an act entitled, " Of the custody and disposition of the estates of idiots, lunatics, persons of unsound mind and drunkards," containing certain other provisions in regard to the same class of persons.   These three statutes above referred to contain substantially all the statute provisions on the subject of lunatics, and all that are necessary to refer to in the examination of this case, except that such prior statutes also refer to the statutes in relation to the support of the poor, for the remedies and manner of enforcing their provisions, and to which last mentioned statutes, therefore, it may also be necessary to refer in this review. The act of 1842, in some of its sections, plainly refers to such existing laws; they are all, therefore, to be regarded as being " in *pari materia.*"   In this respect I differ from the opinion of the Supreme Court.

The defendants are the committee of the estate of one Alfred Tyler, a lunatic, who had been convicted of willful murder at a court of Oyer and Terminer in Onondaga county.

And afterwards, and while said Tyler remained in imprisonment under said charge, and before his sentence on said conviction, the county judge of said county instituted an examination, in the manner required by the statute, as to the insanity of the said prisoner, when the said judge became satisfied that the prisoner was insane. Whereupon the said county judge made an order discharging the said prisoner from imprisonment, and ordered his safe custody and removal to the asylum for the insane at Utica, there to remain until restored to his right mind. This order was duly executed. Tyler was therefore removed to said asylum, where he remained at the time of the commencement of this action. Upon the order of the steward of said asylum the treasurer of the county of Onondaga had paid at various times to the treasurer of the said asylum for the maintenance of said Tyler, the sums of money for which judgment was given in this action. The defendants in this action, as the committee of the said Tyler's estate, etc., have more than sufficient property of the said Tyler to pay the said demand. This action is brought by the board of supervisors of Onondaga county to recover such sums of money as had been paid by said treasurer. The defense interposed is, that the law creates no such liability. This question of liability at law is the only one in the case. If the liability exists it is doubtless created by statute. To determine this question several sections of the statute of 1842, upon which this liability depends, must be read in connection with each other, and with other statutes to which they refer.

The thirty-first section of the act of 1842 provides for the case of lunatics who have *escaped* or been *acquitted* of a criminal charge on the ground of insanity. The court certify such cases to the asylum, and the county from which he is sent is made chargeable with the expense, to which there is a provision added, that the county may recover the amount so paid from his own estate, if he have any, *or from any relative, town, city, or county that would have been bound to provide for and maintain him elsewhere.* The reference here to the *relative*, town, city or county that would have been bound to provide for and maintain him, it is clear, is a reference to

the provisions of the Revised Statutes, to which we have above referred, in relation to the safe keeping and care of lunatics (1 R. S., 634 [marg. p.] § 2), which is as follows: "If such person is not possessed of sufficient property to maintain himself, it shall be the duty of the father and mother and the children of such person, being of sufficient ability, to provide a suitable place for his confinement, and to confine him in such manner as shall be approved by the overseers of the poor of the city or town." It is very clear that this section of the Revised Statutes is not applicable to this case, for it refers only to cases of lunatics who have not sufficient property to support them. By strong implication, however, we may suppose that those who have sufficient property are to have it applied to their support.

"SEC. 3. The overseers of the poor shall have the same remedies to compel such relatives to confine and maintain such lunatic or mad person, and to collect the costs and charges of his confinement, as are given by law in the case of poor and impotent persons becoming chargeable to any town."

By reference to the statute for the relief and support of indigent persons (1 R. S., 615, marg. p.), the remedy in such cases is found, and which is too familiar to be repeated.

The thirty-second section of the act of 1842 is applicable to this case, which is that of a lunatic in confinement (not acquitted), and under indictment. In this last case the county judge certifies to his insanity, upon investigation by physicians, etc., according to the provisions of the statute, and directs his removal to the said asylum to be kept as by the provisions in the thirty-first section. The last clause of this section, and which is the clause upon which the defense is based, is in the following words: "The provisions of the last preceding section (thirty-one), requiring the county to defray the expenses of a patient sent to the asylum, shall be equally applicable to similar expenses arising under this section and the one next following." Now, it is claimed by the defendants, that, though the thirty-second section made the county of Onondaga liable for the support and mainte-

nance of this lunatic, it did not, as did the thirty-first section, give the county a remedy over against the estate of the lunatic. And that this express grant of a remedy in the one case, and the omission to grant it in the other, is evidence of intent in the former, and demands the construction, that it was not so intended by the latter section. Although no reason can be seen for making a distinction, still, if the enactment in the statute of 1842 referred to no other, and ended with the thirty-second section, I should be inclined to hold to the correctness of the defendants' construction. But there are other and further provisions in this statute to be considered, which have an important bearing upon the intent of the legislature by this enactment.

The thirty-fifth section makes provision for the regulation of the price to be paid for keeping poor or indigent patients to be sent to the asylum, which is not a general. provision, but applies only to the indigent.

The thirty-sixth section provides that every insane person supported in the asylum, shall be personally liable for his maintenance therein, and for all necessary expenses incurred by the institution in his behalf. And the *committee*, relative, town, city or county, that would have been bound by law to provide for and support him if he had not been sent to the asylum, shall be liable to pay the expenses of his clothing and his maintenance in the asylum, and actual necessary expenses to and from the same." This section, so far as it applies to the persons to be made liable, is general, and is important in its effect in giving construction to the others. First, it plainly makes the lunatic personally liable, so that his estate could be reached, whether or not a committee had then been appointed; second, it provides in case of the appointment of a committee, that they be made liable to the extent of his estate for his support, just as they would have been if he had not been sent there; and, third, it provides, in the absence of his having property, or a committee, that the existing laws, which made relatives, towns and counties liable for the support of the insane and poor, shall be resorted to, which in like manner made them liable

for the maintenance and support of such insane person in this State institution. This section really declares no new rights or remedies in regard to the poor and indigent, but makes existing rights and remedies applicable to the support of such persons in this asylum. (*People* v. *Supervisors of Genesee*, 7 Hill., 173.) But it is still insisted, that, although this section fixes the liability of the lunatic and his committee for his support, it is only a liability to the State asylum, or to its proper officers, and does not give the county which paid the money in the first instance a remedy over against the committee. This same argument would render the proviso creating the liability entirely nugatory; for neither does it provide the State with any form of remedy to enforce the liability against the lunatic or his committee. The argument has no basis of support, but the strictest technicality; it is reasoning against the plainest dictate of justice, that a statute should create a liability against a party, or compel another party to pay such liability, and yet afford the suffering party no remedy.

The thirty-seventh section of the act of 1842, which is general, makes the county from which such patient was sent liable to pay such expenses, and directs the treasurer of such county to pay such expenses to the treasurer of the asylum. The last clause of this section is in the following words: "Said county, however, shall have the right to require any *individual*, town, city or county, *that is legally liable for the support of such patient, to reimburse the amount of said bills*, with interest from the day of paying the same." It is very clear that this section does in terms give a remedy over upon the person, whoever it may be, that is legally liable. Who then is the person legally liable under this section, in a case where it is admitted there is sufficient means of the patient to pay? Clearly, the insane person so supported. The thirty-sixth section makes him so in terms. And his committee are the proper persons to be sued. In this particular consists the distinction between this case and that of *The People* v. *The Supervisors of Genesee* (*supra*), which is claimed to be controlling. In that case the town was sued, and the

town was held not to be liable for the reason that the party who had been so supported, was not a "*pauper*," nor "*furiously mad.*" Paupers and persons furiously mad were the only classes of persons that come within the sections of the Revised Statutes upon which the liability over in that case was claimed. That case decided only that question. It has no application here. The distinction between the cases is clear and palpable; and the decision of this case in the court below is not in conflict with that. To make the provision clear, and to adapt the whole system of the support of lunatics by all former laws to the new system connected with the State asylum, the act of 1842 provides as follows:

"Sec. 39. Every town or *county* paying for the support of a lunatic *in the asylum*, or his expenses in going to or from the same, shall have the like rights and remedies to recover the amount of such payments, with interest from the time of paying each bill, as if such expenses had been incurred for the support of the same under existing laws."

It is very clear that the provisions of this thirty-ninth section were intended to superadd, to the remedies already given in that act, the remedies which existed in the former statutes. It may be useful to refer to these former statutes as evidence that they also evince the same spirit and design of casting the liability of support upon the estate of the lunatic when he is possessed of means.

What then were the rights and remedies by the existing laws in relation to the support of the insane, referred to in this thirty-ninth section? By 1 R. S., 634, § 1: "When any person by lunacy or otherwise becomes furiously mad, or so disordered in his senses as to endanger his own person, or the person or property of others if permitted to go at large, who is possessed of sufficient property to maintain himself, it shall be the duty of the committee of his person and estate to provide a suitable place for his confinement, and to confine and maintain him in such manner as shall be approved by the overseers of the poor of the city or town." Section thirteen of the same act gives to the overseers of the poor of any city or town the same remedies, to compel the committee

of the estate of any lunatic to confine and maintain such lunatic, and to collect of such committee the costs and charges of his confinement and support as are given in the same act against the relatives of a lunatic ; and the fourteenth section of the same act gives to *superintendents* of the poor of the county the same power as is given by the thirteenth section to *overseers* of the poor. And this same power, by section thirty-nine of the act of 1842, is given to the *county* (to wit, the board of supervisors). The remedies by the existing laws so referred to, were the third, thirteenth and fourteenth sections of the Revised Statutes, *supra*, and also in part by the provisions of the act of 1827 (chap. 294), entitled "An act respecting lunatics," section five of which provided that " whenever a lunatic shall be confined pursuant to law, if such lunatic is possessed of any real or personal property, the same shall be first applied to defray the expenses of his confinement and support."

The difficulty that is found in determining the meaning and intent of the provisions of these several sections of the statute of 1842, arises from the fact of the existence, at the time of its passage, of two or more other statutes, relating in some particulars to the same subject, some of the provisions of which older statutes are partially modified by the act of 1842, and the act of 1842 refers to such existing statutes for the proper remedies. This difficulty is still increased when reference is made to the said existing statutes, as they refer again to statutes in relation to the support of the poor, for the kind of remedies which they afford against parties liable to support others.

But as I have already said, the statute of 1842 contains all the provisions applicable to this particular case, necessary to give the construction that the defendants are liable, that the action is well brought by the county of Onondaga, and that the estate of the lunatic is liable over for the sums they have paid on his account. Such, I think, is the letter, as well as the intent of the statute. I think the judgment should be affirmed.

All concur. Affirmed.