THE COUNTY OF JEFFERSON, Appellant, *v.* THE COUNTY OF OSWEGO, Respondent.

*A resident of one county committed to an asylum for insane criminals for an offense committed in another county — the latter county cannot recover from the former the expense of his support — effect of payments having been made — vested rights under a statute — presumption as to its being a town rather than a county charge.*

September 27, 1885, one Briggs, an unmarried man, living with his parents in the town of Sandy Creek, Oswego county, was indicted by a grand jury in Jefferson county for a crime alleged to have been committed by him in said county. Upon his arraignment he entered a plea of insanity, which resulted in a determination that he was insane and his confinement in the Utica asylum until February 28, 1898. On the latter date he was transferred to the Asylum for Insane Criminals at Auburn and later was transferred to the Matteawan State Hospital, where he has since been confined. The county of Jefferson has paid for the support and maintenance of Briggs during the entire period, and, until 1897, was reimbursed therefor by the county of Oswego.

Section 662 of the Code of Criminal Procedure provides that when a person pleading insanity in criminal proceedings is sent to a State lunatic asylum "the expenses of sending the defendant to the asylum, of keeping him there and of bringing him back are, in the first instance, chargeable to the county from which he was sent, but the county may recover them from the estate of the defendant if he have any, or from a relative, town, city or county bound to provide for and maintain him elsewhere."

In an action brought by the county of Jefferson against the county of Oswego to recover the amount which it had paid for Briggs' support and maintenance since 1897 it appeared that Briggs had no estate or relatives from which the expenses of his support could be collected.

*Held,* that the plaintiff could not recover;

That assuming that Briggs was an indigent insane person, and that, at the commencement of his confinement, there was in force a statute (Laws of 1874, chap. 446, tit. 1, § 14, as amd. by Laws of 1880, chap. 164) which imposed upon the defendant county liability for his maintenance, these circumstances did not entitle the plaintiff to recover, as said section 14 was specifically repealed by chapter 545 of the Laws of 1896 and a different scheme provided by that act for the support of persons situated as Briggs was;

That the failure of the Legislature to amend that provision of the Code of Criminal Procedure, which provides, " The county may recover them from the * * * county bound to provide for and maintain him elsewhere," did not establish an intention on the part of the Legislature to continue the defendant's liability for the support of Briggs;

That the plaintiff county did not acquire by virtue of section 14 of title 1 of chapter 446 of the Laws of 1874 any vested rights against the defendant which it was not competent for the Legislature to take away by repealing the said section;

That, assuming that Briggs was a pauper, the plaintiff was not entitled to recover, as, in the absence of proof, which it was incumbent upon the plaintiff to produce, that the board of supervisors of the defendant county had filed the determination abolishing the distinction between town and county poor, it would be presumed that the support of Briggs would be a charge upon the town in which he resided rather than upon the county;

That the action of the board of supervisors of the defendant county in auditing and paying for several years the claims made by the plaintiff for the support of Briggs did not constitute an admission of liability which would take the place of other evidence.

McLENNAN, P. J., and WILLIAMS, J., dissented.

APPEAL by the plaintiff, The County of Jefferson, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Jefferson on the 7th day of May, 1902, upon the decision of the court, rendered after a trial at the Jefferson Special Term, dismissing the plaintiff's complaint upon the merits.

*E. C. Emerson,* for the appellant.

*Merrick Stowell,* for the respondent.

HISCOCK, J.:

This action is brought to recover over from the defendant the sum of $781.08, which the plaintiff paid for the support and maintenance of one Briggs in the Matteawan State Hospital, said Briggs being a person under indictment, whose trial was

suspended pending his confinement in such hospital on account of insanity.

The learned trial justice before whom the case was tried held as matter of law that the plaintiff could not recover upon the undisputed and established facts, and we think that he was correct in his conclusions and that the judgment should be affirmed.

Briggs was an unmarried man living with his parents in the town of Sandy Creek, Oswego county. Upon September 27, 1885, he was indicted by a grand jury in Jefferson county for the crime of assault alleged to have been committed by him in said county. Upon arraignment he entered a special plea of insanity, and thereupon, in accordance with the provisions of the Code of Criminal Procedure (§ 658 *et seq.*), proceedings were instituted to determine his sanity or insanity. These proceedings resulted in the determination that he was insane, and thereupon he was confined in the Utica Asylum until February 28, 1888, when he was transferred to the Asylum for Insane Criminals at Auburn, and later to the Matteawan State Hospital, where he has since been confined.

The plaintiff was called upon to pay and did pay for his support and maintenance the sum of $195 per year, in accordance with the provisions of section 662 of the Code of Criminal Procedure. A bill for the amount so paid each year was by it presented to the board of supervisors of Oswego county, which audited and allowed the same from the day of commitment down to and including September 30, 1897. Since then the defendant has refused to pay said bills which have been presented the same as formerly.

It was held by the trial court, and we think properly, that as a matter of practice this action might be maintained against the defendant but that the facts did not warrant a recovery.

Section 662 of the Code of Criminal Procedure, already referred to, provides that when a person pleading insanity in criminal proceedings is sent to a State lunatic asylum, " the expenses of sending the defendant to the asylum, of keeping him there and of bringing him back, are, in the first instance, chargeable to the county from which he was sent, but the county may recover them from the estate of the defendant, if he have any, or from a relative, town, city or county, bound to provide for and maintain him elsewhere."

It is conceded that Briggs has no estate or relative from which or

whom the expenses paid by the plaintiff may be collected. The plaintiff seeks to hold the defendant liable upon either one of two theories which may be briefly discussed.

It is urged that Briggs was an indigent insane person, and that there was a general liability upon the part of the defendant county in which he had his residence to provide for his maintenance as such, and that, therefore, it was liable under the particular circumstances of this case within the language of the section just quoted, because of its being the " county bound to provide for and maintain him elsewhere." Chapter 446 of the Laws of 1874 is relied upon as imposing upon the defendant the necessary general liability for the maintenance of Briggs. Section 14 of title 1 of this act (as amd. by Laws of 1880, chap. 164) did make provision for the care and maintenance of a person in indigent circumstances, not a pauper, becoming insane, and we shall assume that said act did impose upon the defendant a general responsibility for the care of indigent insane persons who had not been committed to an asylum in connection with criminal proceedings. (*People ex rel. Blenheim* v. *Supervisors,* 121 N. Y. 345.)

We fail to see, however, how that act can be made the basis of a recovery of the sum paid for the maintenance of Briggs since September, 1897, because said section was repealed by chapter 545 of the Laws of 1896, and by said latter act (§ 65) a new scheme was devised whereby indigent insane persons, not in confinement under criminal proceedings, were to be maintained at the expense of the State with a right to reimbursement from relatives or friends.

No other source of authority for the recovery of the amount paid out by plaintiff for the support of Briggs as an indigent insane person has been called to our attention than the statute thus repealed.

But while it is conceded that section 14 of title 1 of chapter 446 of the Laws of 1874 (as amd. *supra*), which we have assumed would have made defendant liable for the support of Briggs " elsewhere" within the meaning of section 662 of the Code of Criminal Procedure, has been specifically repealed, and while we are pointed to no other direct source of liability by defendant to plaintiff for his support, it is still urged that we may find such basis for liability by divining what must have been the legislative intent upon this subject.

It is reasoned in substance that after the repeal of said section 14 in 1896, section 662 of the Code of Criminal Procedure still remained which made plaintiff liable for the support of Briggs and allowed it to recover over from a county liable for his maintenance " elsewhere ; " that it could not have been the intention of the Legislature to make the plaintiff liable for the support of Briggs simply because he came there and committed a crime and at the same time relieve the defendant where he resided, but that said Legislature must have intended to preserve this latter liability although in terms repealing it. And support is sought for this argument in the fact that sections 22 and 26 of title 1 of chapter 446 of the Laws of 1874, which also provide for the recovery over by a county paying the expense of certain insane criminals from another county which would have been bound to provide for them " elsewhere," were not repealed. It is not claimed that Briggs was committed under these sections and their only force is by way of analogy. If it be admitted that the results accomplished, by repealing one provision and leaving the others, do seem somewhat unjust in this case, that will not empower us by construction to supply the place of requisite statutory provisions which have in fact been repealed. The question is, was the defendant bound to maintain Briggs " elsewhere," that is, as an ordinary indigent insane person during the years in question?

In making the changes in its scheme of caring for the insane embodied in the statute of 1896 repealing portions of the statute of 1874, whereby, generally speaking, they became a charge upon the State instead of upon localities, the Legislature may have overlooked the clause already quoted in another statute like the Code of Criminal Procedure which incidentally provided for a recovery over based upon a possible general liability to maintain insane persons not criminal. Or it may have been deemed proper, in an abundance of caution and under no circumstances objectionable, to leave the provisions that a county paying the expenses of an insane criminal should be entitled to get them back from a county which would have been obliged to support him elsewhere, if any such there was. That did not create a liability if it did not exist and we do not think it did exist after July 1, 1896, when the statute of 1896 took effect. The policy for a time after July 1, 1896, of still holding a county liable in the case of an insane person

confined in connection with criminal proceedings like Briggs seems to stand by itself and not at all to infringe upon the general doctrine of relieving counties from liability for such support "elsewhere." (Laws of 1896, chap. 545, § 101; Laws of 1901, chap. 546, amdg. Laws of 1896, chap. 545, § 65.)

And it is very significant that these later statutory enactments making liable the county sending to the hospital the insane criminal did not contain any provision giving such county a right of recovery of said expenses from the county in which the insane person had had his residence, such as is found in the earlier provisions of section 662 of the Code of Criminal Procedure.

Later, apparent doubt of the justice of making liable the county where simply an offense was committed by a person afterwards confined as insane made itself manifest in legislation. Section 65 of chapter 545 of the Laws of 1896 was amended by chapter 380 of the Laws of 1900, so as to contain the provision that "the maintenance of any inmate of a *State Hospital* committed thereto upon a court order arising out of any criminal action or proceeding shall be paid by the county from which such inmate was committed." By chapter 260 of the Laws of 1899, however, section 101 of chapter 545 of the Laws of 1896 had been amended so as to provide that when, as might be done, an insane inmate of a "State Hospital" committed thereto upon the order of a court of criminal jurisdiction was transferred to the *Matteawan* State Hospital, his expenses should be paid by the county in which the criminal charge arose or the conviction or acquittal was had "if the person was then a resident of that county," and in other cases should be a charge against the State, and this limitation of liability continued in force until April 29, 1904. (Laws of 1900, chap. 380, and Laws of 1904, chap. 525, amdg. Laws of 1896, chap. 545, § 101.) The amendment of 1904 provided that from and after October 1, 1904, the expenses should be a State charge, but no provision was made for the payment between April 29, 1904, when the amendment took effect, and October 1, 1904. There is to be noted this difference in liability for the expenses of an insane person depending upon his confinement in the Matteawan Hospital or some other. Briggs was originally sent to the State Lunatic Asylum at Utica (which is described as a State

FOURTH DEPARTMENT, MARCH, 1905.                    [Vol. 102.

hospital in these acts), but he was transferred to the State hospital at Matteawan upon its establishment.

Independent of the question of plaintiff's liability to pay at all for his expenses there for the years 1899, 1900 and 1901, subsequent to April 6, 1899, when the amendment to section 101 of the statute of 1896 was first adopted, which is not raised, it hardly seems necessary for the Legislature to have adopted this provision limiting the liability of a county sending to the hospital an insane criminal person to the case of a resident and making the expense otherwise a State charge, if during all of this time the law permitted a county paying for a non-resident to immediately reimburse itself by recovery over from the county of residence.

A review and consideration of all of these provisions leads to the conclusion that after the repealing legislation of 1896, already cited, the Legislature did not, and did not intend to, preserve a general liability upon the part of counties for the support " elsewhere " of indigent insane not confined in connection with criminal proceedings which may be made the basis of recovery in this action, and if after said date of repeal there be found remaining somewhere an isolated clause referring to such former general liability, we think it is to be ascribed to inadvertence rather than made the foundation for attempting to perpetuate by a process of statutory construction provisions which have been definitely and specifically repealed.

No authorities are cited to sustain the proposition somewhat tentatively made, that because at the time Briggs was sent to the asylum there existed a statute permitting the county of Jefferson to recover from the county of Oswego what it paid for his support and maintenance, the former acquired vested rights against the latter which could not be impaired by subsequent legislation. It does not seem to us that this view can be successfully maintained. The whole subject is controlled by statutory enactment against the will or at least without the consent of the counties. The county of Jefferson did not send Briggs to the insane asylum and incur expenses for his maintenance there in reliance upon the statute that it might recover back said expenses from the defendant. The statute provided that independent of any consent by said county Briggs should be sent to the asylum and that his expenses there would be a charge against the county sending him. The Legislature, it is true, at that time

gave the county so sending him a right of action over against the county where he lived, but this was not any element in or foundation for the proceedings which resulted in the original commitment. It was a manner of relief which at the time the Legislature deemed proper to give to the county of Jefferson and there seems to us to be no doubt that the Legislature had a perfect right, if it wished, to cancel this relief, shift the responsibility for the maintenance of the insane criminal, and make it a charge either solely upon the county of Jefferson, or, if it saw fit, upon the county of Oswego, or as a matter of fact, as it has done since, a charge upon the State at large. This was a subject for the consideration and determination of the Legislature and we discover no element of contractual or vested rights in favor of the plaintiff and against the defendant binding upon the Legislature and preventing it from doing as we think it did do.

In the second place, however, it is urged that Briggs was a pauper, and, therefore, his support was a charge against the defendant. We think, however, that the plaintiff has failed to sustain its action upon that theory, assuming that its premises as to the pauperism of Briggs are well laid.

Under the general statutory provisions applicable to the subject there was originally, at least, a distinction between town and county poor in the county of Oswego, and said Briggs, by reason of his residence in the town of Sandy Creek, would be a charge upon the town rather than upon the county. The board of supervisors had the power to abolish this distinction between town and county poor by making and filing such determination. We think that if in the county of Oswego the general rule had been modified and the distinction in question abolished by the affirmative action of the board of supervisors, it rested with the plaintiff to give proper and adequate proof of such change. This it failed wholly to do.

It is urged that the action of the board of supervisors of the defendant in auditing and causing to be paid for several years the claims made by the plaintiff for the support of Briggs may be taken and regarded as an admission of liability which will take the place of other evidence. We are, however, unable to assent to this doctrine. No adequate basis for liability upon the part of the defendant for these charges existed, independent of statutory provision.

The rights and obligations of the defendant were defined by such statutes, and we regard it as too well settled to require discussion or citation of authorities that the board of supervisors did not have any general power in such matter as this to bind their county to an obligation and liability which did not otherwise exist.

In accordance with these conclusions we think the judgment appealed from should be affirmed, with costs.

SPRING and STOVER, JJ., concurred; WILLIAMS, J., dissented in an opinion in which McLENNAN, P. J., concurred.

WILLIAMS, J. (dissenting):

The judgment should be reversed and a new trial ordered, with costs to the appellant to abide event.

The action was brought to recover amounts paid by Jefferson county for the maintenance of one Briggs, an insane person, at the State hospital, he being a resident of Oswego county. The trial court dismissed the complaint on the merits. The action was based upon the provisions of sections 658–662 of the Code of Criminal Procedure.

Briggs, residing in the town of Sandy Creek, Oswego county, went over into the adjoining town of Ellisburg, Jefferson county, and committed a crime, a felony. He was indicted at the Oyer and Terminer in Jefferson county in September, 1885, and, upon being arraigned, a plea of insanity was interposed for him. Thereupon the court appointed a commission under section 658 of the Code of Criminal Procedure to examine and report as to his sanity. The case was sent to the Court of Sessions, and the commission directed to report to that court. The commission reported that Briggs was insane, and the court, under section 659 of the Code of Criminal Procedure, ordered him committed to the State lunatic asylum. He was received into the asylum and has ever since remained in some State institution for the insane, and is there now. Section 662 of the Code of Criminal Procedure provided: " The expenses of sending the defendant to the asylum, of keeping him there and of bringing him back, are in the first instance chargeable to the county from which he was sent, but the county may recover them from the estate of the defendant, if he have any, or from a

relative, town, city or county *bound* to provide for and maintain him *elsewhere.*"

This act was chapter 442 of the Laws of 1881, and this section has never been changed since originally enacted in 1881. Pursuant to the provision of this section Jefferson county has every year been called upon by the State to pay, and has paid, for keeping Briggs in the asylum or hospital for the insane. It has every year presented a bill for the amount so paid to Oswego county, and the same has been paid down to and including the year 1897. Payment was refused for the years 1898 to 1901, both inclusive, and for the amount of these bills this action was brought. There has never been any dispute, and there is none now, that Briggs at and prior to the commission of the crime for which he was indicted, was a resident of Oswego county; that he had no estate from which Jefferson county could recover the amounts paid for his maintenance in the State asylum or hospital; that he had no relative from whom such recovery could be had; that he had never before he was indicted been a pauper, or a charge as such upon his town or county. The claim always made and still made was and is that he was an indigent insane person, not a pauper; that is, a person who usually provided for himself or was provided for by friends, and who needed assistance only when sent to an asylum under the visitation of insanity. It will appear from an examination of the statutes and the adjudged cases that the county and not the town during all the years since 1842, has been bound to provide for the support and maintenance of such persons residing within the county in the State institutions for the insane. And if that be true, then, under the provision of the Code of Criminal Procedure, the county of Oswego was liable to the county of Jefferson in this action.

In *People ex rel. Blenheim v. Supervisors* (121 N. Y. 345, 349), O'BRIEN, J., said: " It will be seen by a careful examination of the statute that there is a clear and well-defined difference in the method provided for the maintenance and care of *pauper* lunatics, and that other class of persons called indigent insane persons, but not paupers. The policy of the State in regard to the latter class is well expressed by an eminent author in the following language: ' The

law of indigence as distinct from pauperism was first introduced among our lunacy statutes in 1842 (Chap. 135, § 26). It was designed for the benefit of that laboring population, which is only self supporting while employed, etc. Hence such persons are accorded a temporary support from the county for a specified time. * * * This support being a county charge, cannot as in the case of paupers, be cast upon any particular town in which the indigent lunatic may have had a residence.' (Ordronaux's Judicial Aspect of Insanity, 87.)"

Sections 26 and 27 of chapter 135 of the Laws of 1842 provided for the support and maintenance of an insane person for two, three and five years at the expense of the county, when such person was in indigent circumstances, not a pauper, having an estate insufficient to support himself or himself and family under the visitation of insanity, and sections 31, 32, 36, 37 and 39 provided for the confinement of insane persons acquitted on the ground of insanity or held under indictment or sentence for a crime, and provided that the county from which such persons were sent should pay all expenses of his confinement, but might recover the amount so paid from the estate of the insane persons if they had any, or from any relative, town, city or county that would have been bound to provide for or maintain him elsewhere. It will be seen that this is the identical provision contained in section 662 of the Code of Criminal Procedure in question here. (See *Supervisors of Onondaga County* v. *Morgan,* 4 Abb. Ct. App. Dec. 335; *People* v. *Supervisors of Genesee,* 7 Hill, 171.) In this latter case a definition of indigent insane persons was given, substantially as I have given it above, and it was held that the county having, under section 26 of the act of 1842, paid the expenses of an indigent insane person, could not recover the same from the town where the insane person resided, the county alone being responsible therefor. This case appears to be fully approved by the Court of Appeals in the *Blenheim* case, above cited. Apparently the act of 1842 was not changed in the respects above referred to until the enactment of chapter 446 of the Laws of 1874. That act revised and consolidated the statutes of the State relating to the care and custody of the insane, the management of the asylums, etc., and repealed all laws inconsistent therewith. Sections 14 and 15 of title 1 of the act of 1874

(as amd. by Laws of 1880, chap. 164) were practically the same as sections 26 and 27 of the act of 1842, at least so far as the question we are considering is concerned. Sections 20–36 of title 1 of the act of 1874 provided for the commitment of the insane by criminal process, substantially as sections 31–39 of the act of 1842, but in greater detail. Section 26 of title 1 of the act of 1874 provided especially as to a person in confinement under an indictment, and had the same provision in almost the identical language quoted above (Code Crim. Proc. § 662), the language of said section being, "When such person is sent to an asylum, the county from which he is sent shall defray all his expenses while there and of sending him back if returned, but the county may recover the amount so paid from his own estate, if he have any, or from any relative, town, city or county that would have been *bound* to provide for and maintain him elsewhere." Section 32 of title 1 of the act of 1874 also related to the same subject, a person in confinement under an indictment, and provided for the payment of the expenses in nearly the same language as said section 26. Said section 32 was amended by chapter 515 of the Laws of 1884, but the general features of the section were preserved. Section 22 of title 1 of the act of 1874 related to a person who had escaped indictment or conviction by reason of insanity, and provided for the payment of the expenses in the same language almost precisely as said section 32, and nearly the same as said section 26. There appears to have been no material change in these provisions from 1874 until 1896 when chapter 545 of the laws of the latter year was enacted. That act related apparently to the whole subject of insanity and the care and custody of insane persons, and was designated as chapter 28 of the General Laws. It repealed all the provisions of the act of 1874 as to the insane other than some of the provisions relating to those confined under criminal proceedings, and in place of sections 14 and 15 of title 1 of that act (as amd. *supra*), enacted section 65, which provided that "all poor and indigent insane persons not in confinement under criminal proceedings shall, without necessary delay, be transferred to a State hospital, and there wholly supported by the State." It saved from repeal sections 22 and 26 of title 1 of the act of 1874 hereinbefore referred to relating to the criminal insane, and left unrepealed and unchanged

section 662 of the Code of Criminal Procedure enacted in 1881, under which this action is brought. It provided by sections 90–104 for a State hospital for insane criminals known as the Matteawan State Hospital, and the care of the insane therein, and by section 101 provided for the transfer of certain insane inmates of a State hospital to such hospital for criminal insane, and added, "and the county in which the criminal charge arose, or conviction or acquittal was had, shall defray all the expenses of such person while at the Matteawan State Hospital, and the expenses of returning him to such county," and by section 102 provided for the recovery for the support of any patient in such criminal insane hospital chargeable under the law to counties or penitentiaries.

It is somewhat interesting to note the legislation following the enactment of this act of 1896. By chapter 451 of the Laws of 1897 and chapter 417 of the Laws of 1898, section 26 of title 1 of the act of 1874 was amended by inserting some provisions not material to our inquiry here, but the sentence with reference to the payment of the expenses of the care, etc., of the insane persons was retained precisely the same as in the act of 1874. In the appropriation bill for the support of the insane under chapter 545 of the Laws of 1896, passed in 1897 and being chapter 460, is found the following sentence : " The maintenance of any inmate of a State hospital committed upon a court order arising out of any criminal action or proceeding, shall be paid by the county from which such inmate was committed, and in the event that any such inmate is transferred to the Matteawan State Hospital, or transferred from said hospital to one of the State hospitals, such transportation shall be paid by said county." By chapter 260 of the Laws of 1899, section 101 of the act of 1896 was amended so that the part quoted above should read as follows : ." And the county in which the criminal charge arose, or conviction or acquittal was had, *if the person was then a resident of that county*, shall defray all the expenses of such person while at the Matteawan State Hospital, and the expenses of returning him to such county ; *in any other case such expense shall be a charge against the State.*" The portions italicized were added by this amendment. This section 101 of the act of 1896 was again amended by chapter 380 of the Laws of 1900 in a matter of detail not material here. The clause above quoted remained sub-

stantially unchanged. Section 65 of the act of 1896 was amended by chapter 546 of the Laws of 1901 in particulars not important here, and then there was added at the end thereof this language: "The maintenance of any inmate of a State hospital, committed thereto upon a court order arising out of any criminal action, shall be paid by the county from which such inmate was committed." This latter provision had been first added in substantially the same words by chapter 380 of the Laws of 1900. Section 101 of the act of 1896 was again amended by chapter 525 of the Laws of 1904. The provision with reference to expenses above quoted was omitted entirely, and in place thereof were inserted the words, "From and after October first, nineteen hundred and four, all persons then inmates of the Matteawan State Hospital and all persons thereafter committed to its custody shall be a charge upon the State." By this provision the troublesome question we are considering has been set at rest for the future. However, this litigation relates to the support of this indigent insane person during four years following the passage of the act of 1896. Section 662 of the Code of Criminal Procedure provided that the county paying the expenses of the support of the insane criminal might recover them from *the town or county bound to provide for and maintain him elsewhere*, the meaning of which was apparently that if any other town or county would have been *bound* to support the lunatic if not a criminal, it would be liable for such expenses to the county where the criminal proceedings were pending.

Briggs was an indigent insane person residing in Sandy Creek, Oswego county, when the commitment to the asylum was made. There could be little doubt that Oswego county and not the town of Sandy Creek was bound to support and maintain him in the asylum if not a criminal down to the passage of the act of 1896. This was a result at least of sections 14 and 15 of title 1 of the act of 1874 (as amd. *supra*), and then, since he was a criminal, section 26 of title 1 of the act of 1874 and section 662 of the Code of Criminal Procedure passed in 1881 permitted the recovery by Jefferson county from Oswego county of such expenses. The county of Oswego recognized its liability during that time and paid without litigation. Since the passage of the act of 1896, however, the matter has been more or less in doubt. Section 65 of that act made

all expense of maintaining indigent and pauper insane, other than criminals, thereafter a State charge.   The Legislature did not make the expense of maintaining criminal insane a State charge until October 1, 1904.   It retained sections 22 and 26 of title 1 of the act of 1874 and section 662 of the Code of Criminal Procedure, and inserted sections 101 and 102 in the act of 1896, all clearly making the maintenance of the criminal insane originally a charge against the county committing them, and sections 22 and 26 of title 1 of the act of 1874 and section 662 of the Code of Criminal Procedure gave such county a claim over against others, including the county bound to support him at the time, for the amount so paid.   It seems to me that the Legislature intended to reserve this liability of the county of the criminal's residence for his support during all the years from July 1, 1896, to October 1, 1904.   The intention may not be very clearly indicated.   If not, why was the language of sections 22 and 26 of title 1 of the act of 1874 and of section 662 of the Code of Criminal Procedure retained ?   Why was the same language retained in the amendment of this section 26 in 1897 ? In all these the county as well as others is left in the statute as a party liable over, and yet if the Legislature as between two counties intended to make the county where the crime was committed liable and to exempt the county of the residence of the insane person, why was the latter county still left in the statute ? It is true that by section 101 of the act of 1896 the expense of insane criminals was made chargeable to the county where the crime was committed or the conviction or the acquittal was had, without adding the provision for recovery over, and the same is true of the appropriation bill of 1897 (Chap. 460) and of the amendments to section 65 of the act of 1896 made in 1900 and 1901, and that the amendments of section 101 of that act made in 1899 and 1900 added to the provision making the county of the crime or of the conviction or of the acquittal liable, the words "if the person was then a resident of that county," and added, "in any other case such expense shall be a charge against the State," but all this time sections 22 and 26 of title 1 of the act of 1874 (as amd. *supra*) and section 662 of the Code of Criminal Procedure were retained in the same identical language.   It seems to me it was never the design to continue the liability of the county of the crime or of the conviction,

or of the acquittal and take away its right to recover over against the county of the residence of the insane person. Any other result would be a great injustice to the county where the crime was committed. Briggs resided in Oswego county and that county was liable for his maintenance as an indigent insane person. He went over the county line and committed a crime in Jefferson county. If his own county had done its duty he would already have been in an asylum, and would not have been at large to commit the crime, and yet it is claimed that his maintenance in the hospital should be imposed upon Jefferson county and Oswego county relieved therefrom.

I cannot believe that the Legislature intended that any such injustice should be possible under the statutes. Again it is not disputed that the county of Oswego was liable over at the time the commitment was made and remained so from 1885 to July 1, 1896, and recognized such liability. Should not the rights of the counties be determined as of the time the commitment was made? Could the Legislature by any act it might pass interfere with the vested rights of Jefferson county? So long as the State held Jefferson county liable to pay in the first instance for the maintenance of Briggs, could the Legislature pass any act relieving Oswego county from its liability over under the statute? If it had the power to do so can it be said that the Legislature intended such an injustice to a county situated as Jefferson county is?

And *my* conclusion is that the defendant is liable and should be compelled to respond to the plaintiff for the claims made the basis of this action.

I think the judgment should be reversed and a new trial ordered, with costs to appellant to abide event.

McLennan, P. J., concurred.

Judgment affirmed, with costs.